**Limpieza CIUDADANA, et al., Plaintiffs,**

v.

**Aurelio GRACIA, et al., Defendants.**

**Civil No. 02–2191(DRD).**

United States District Court, D. Puerto Rico.

July 21, 2003.

Salvador Tio–Fernandez, Santurce, PR, Jose R. Ortiz–Velez, San Juan, PR, Roberto A. Fernandez–Quiles, Hato Rey, PR, for Plaintiffs.

Ramon L. Walker–Merino, San Juan, PR, Rene Arrillaga–Belendez, Arrillaga & Arrillaga, San Juan, PR, for Defendants.

### OPINION & ORDER

DOMINGUEZ, District Judge.

## I. INTRODUCTION

Pending before the Court are Plaintiffs', Limpieza Ciudadana (hereinafter referred to as "LC" or the "party", et al.), Motion Requesting Preliminary Injunctive Relief (Docket No. 17), and subsequent Amended Complaint (Docket No. 29). Plaintiffs seek declaratory and injunctive relief to declare certain sections of the Puerto Rico Electoral Act, 16 P.R. Laws Ann. § 3101 *et seq.*, and the Commonwealth Electoral Commission Regulations for the registration of a new political party by petition, in violation of the United States Constitution, specifically its First and Fourteenth Amendments. The instant case involves a constitutional challenge to Articles 3.001(3) and 3.002 of the Puerto Rico Electoral Act, 16 P.R. Laws Ann. §§ 3101(3) and 3102, for alleged violation of Plaintiffs' First Amendment rights to freedom of speech and association. Plaintiffs further challenge the validity of the regulations approved by the Commonwealth Electoral Commission (Puerto Rico State Elections Commission "PRSEC"), for the registration and access to the ballot of new, Commonwealth-wide political parties, "Reglamento para la Inscripción de Partidos por Petición", approved on January 22, 2002 (hereinafter referred to as "Regulation")(Joint Exhibit III). Plaintiffs request the Court to declare 16 P.R. Laws Ann §§ 3101(3) and 3102, and the Regulation in violation of the Constitution, on their face, as well as in their application to Plaintiffs.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs are all citizens of Puerto Rico and of the United States, and are registered voters in compliance with the Puerto Rico Electoral Act, Act No. 4 of December 20, 1977, as amended, 16 P.R. Laws Ann. § 3101 *et seq.* Individual Plaintiffs are members of Co–Plaintiff Limpieza Ciudadana. Defendants are all members of the Commission, to wit, the Chairman of the Commission and the representatives of the three island-wide registered political parties, Partido Nuevo Progresista ("PNP"), Partido Popular Democrático ("PPD"), and Partido Independentista Puertorriqueño ("PIP"), respectively.[1] The Commonwealth of Puerto Rico intervened in defense of the constitutionality of the statutes involved. (Docket Nos. 12 & 15).

---

**1.** Co–Defendant Thomas Rivera–Schatz is the representative for the "PNP"; Co–Defendant Carlos López Feliciano is the representative for the "PPD"; and, Co–Defendant Damaris Mangual is the representative for the "PIP".

Plaintiffs move the Court to order Defendants to accept and validate Registration Petition Forms, "RPF"s (petitions to register a political party), signed and gathered by any citizen, regardless of whether or not signatures are gathered by members of the local bar. Plaintiffs challenge, and request the Court to enjoin Defendants and their agents from enforcing the requirement that Registration Petition Forms be gathered, signed and sworn by a lawyer-notary since such requirement allegedly violates their First Amendment rights. Plaintiffs also request the Court in injunctive mode to order Defendants to accept petitions gathered in the thirty (30) day period prior to filing at the State Elections Commission, rather than in the seven (7) day period prescribed in Article 3.002 of the Puerto Rico Electoral Act, 16 P.R. Laws Ann. § 3102. Plaintiffs further request the Court to order Defendants to accept "RPF"s filed with a list of registered voters organized by alphabetical order, regardless of the precinct were they are registered to vote. (Regulation of January 22, 2002, Article 4, Sections 4.5 and 4.7).

On March 14, 2003, the Court issued an Order mandating Defendants to show cause as to why "RPF"'s signed, gathered and notarized by an *ad hoc* notary (as opposed to notary public), should not be validated and accepted at the "PRSEC". Defendants were also ordered to show cause as to why *ad hoc* notaries should not be authorized to engage upon the process of registering new political parties by petition. The Court relied on the case decided by Hon. Chief Judge Laffitte, finding unconstitutional the requisite of registration by notary publics. *Jose E. Pérez–Guzmán v. Aurelio Gracia, et. al.,* 260 F.Supp.2d 389 (D.P.R.2003). On the other hand, Plaintiffs were ordered to show cause as to why their petitions to invalidate the seven (7) day period requirement to file gathered petitions at the PRSEC, and to also invalidate the regulation section that provides for the RPF's to be filed with a list of registered voters in strict alphabetical order and by precinct number, should not be denied. The Court was under the impression that the latter requests potentially fell under the doctrine set forth under *Buckley v. American Constitutional Law Foundation,* 525 U.S. 182, 185–191, 208, 214, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999), as the challenged statutes, not regulating the communicative aspect of the petition must be differentiated from the aspects of the law that regulate the electoral process per se (Docket No. 18).[2]

---

**2.** The Court's original Order stated, in the pertinent facts, as follows:

In the latest request, Plaintiffs move the Court to order Defendants, Puerto Rico State Elections Commission (hereinafter referred to as "SEC"), et. al., to accept and validate Registration Petitions Forms, "RPF"s (petitions to register a political party), signed and gathered by any citizen, regardless of their profession. Defendants specifically aver that the requirement that Registration Petition Forms be notarized by a lawyer-notary violates their First Amendment rights of freedom of speech and of association. As to this particular request, Defendants are **ORDERED TO SHOW CAUSE** as to why this Court should not issue a preliminary injunction ordering them to accept and validate "RPF"s that are not signed, gathered and notarized by an attorney. Defendants are hence ordered to show cause as to why, pursuant to the reasons set forth by Chief Judge Hector Laffitte in his March 10, 2003, Opinion & Order in the case of *Jose E. Perez–Guzman v. Aurelio Gracia, et. al.,* 260 F.Supp.2d 389 (D. Puerto Rico 2003), this Court should not grant Plaintiffs' request.

Defendant SEC is also ordered to show cause as to why *ad hoc* notaries should not be authorized to notarize registered voters' signatures, since such procedure merely entails the verification of the signatory-voter's identification, being that the individual's drivers license, passport, or any other identification issued by the government. The Court under-

stands that there are other less intrusive and onerous methods through which the State's interest in protecting the integrity of the electoral process can be satisfied. (See Judge Antonio Negron Garcia's dissenting opinions in *Partido Accion Civil v. Estado Libre Asociado*, —— P.R. Dec. ——, 2000 TSPR 29 (2000), and in *Partido Accion Civil v. Estado Libre Asociado*, —— P.R. Dec. ——, 2000 TSPR 61 (2000)).

For example, officials and functionaries at each of the municipalities' Permanent Electoral Registration Boards ("Juntas de Inscripcion Permanentes"), are allowed to verify registered voters' identification and to authenticate their signatures. Totally refusing to implement that kind of mechanism, and instead exclusively requiring a lawyer-notary, charging fifteen dollars ($15.00) per notarization of each "RPF", to provide correctness and legality to the procedure, violates, on its face, First Amendment rights. (A cost of around $1.5 million dollars would be potentially required to register a party, considering that around 100,000 "RPF"s would be required to comply with the 5% statutory requirement of the total of all votes cast in the last election). See *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357–358, 117 S.Ct. 1364, 1370, 137 L.Ed.2d 589 (1997); *Norman v. Reed*, 502 U.S. 279, 288–289, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992); see also, *Cruz v. Melecio*, 204 F.3d 14, 22 (1st Cir.2000). (As the Court of Appeals for the First Circuit stated in the case of *Cruz v. Melecio*, 204 F.3d at 22, "[i]f, for example, the appellants can prove that notarization is prohibitively expensive or otherwise difficult to achieve ..., then the Commission will have to show that the notarization requirement is narrowly drawn to advance a compelling governmental interest", quoting *Norman v. Reed*, 502 U.S. at 288–289, 112 S.Ct. 698). Such electoral Boards engage in a continuous process of registration, transfer, and relocation of voters, which process, at municipal level, obviously must be characterized by integrity. Officials and functionaries at these Boards commonly certify the authenticity of all signatures they collect, thus providing to such supletory mechanism a presumption of "purity" in the electoral process. See Judge Antonio Negron Garcia's dissent opinion in *Partido Accion Civil v. Estado Libre Asociado*, —— P.R. Dec. ——, 2000 TSPR 29, n. 17.

Ad hoc notaries are also available, and alleviate the onerous requirement of only permitting lawyer-notaries to authenticate registered voters' signatures and "RPF"'s. As Chief Judge Laffitte stated in his Opinion & Order in *Jose E. Perez–Guzman v. Aurelio Gracia, et. al., supra*, p. 7:

The Court can conceive of no reason—and Defendants have proffered none—why lawyer-notaries are necessary for the registration of new political parties. In other instances, the SEC relies on the services of ad hoc notaries. Presumably, they fulfill their duties adequately in those situations. Ad hoc notaries were allowed for the petitions of the 1998 status plebiscite. If the SEC relies on ad hoc notaries for elections dealing with topics as important as the status of Puerto Rico, it is reasonable to assume that they would also be competent enough for the registration of new political parties. It is thus unclear why lawyers are required in the particular circumstances of the present case. A lawyer will notarize a signature merely by verifying the signatory's identification. This is not a complex task that requires special training or skill. There is no reason to believe that attorneys who happen to be notaries are somehow more adept than non-lawyers at reading and verifying an individual's drivers license or passport.

Furthermore, the Court is under the initial impression that the State's justification in that only lawyer-notaries provide the required integrity to the electoral process seems somewhat suspicious. The Court explains. The State finds a basis for such reason on the established **"tradition"** that, in electoral processes, only lawyer-notaries can, through their "dacion de fe", avoid fraud and frivolous candidacies, and that compliance with the lawyer-notary requisite has been in the past traditionally expected and demanded. The undersigned has doubts, following the lead of Judge Negron Garcia in the Supreme Court cases (Opinion and *per curiam* Reconsideration) of *Partido Accion Civil v. Estado Libre Asociado, supra,* as to whether such "tradition" really exists, and hence speculates whether or not the statute will survive a strict scrutiny test. The Court is cognizant that the State has ample authority and broad discretion when regulating the electoral process. That notwithstanding, any such regulations cannot impose severe and onerous restrictions, which may cause that the communicative rights of the First Amendment be severely curtailed. The Court harbors no doubt that the challenged statute must be analyzed under the strict scrutiny standard, because prima facie, First Amend-

Both parties appeared and submitted briefs showing cause.[3] Defendants there-after answered the Amended Complaint. (Docket No. 36). On July 11 and 14, 2003,

ment rights are involved. *McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 335, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995); *Cruz v. Melecio*, 204 F.3d at 22. "[C]ourts must view severe restrictions on party ballot access skeptically, affording exacting scrutiny to such restrictions" *Cruz v. Melecio*, 204 F.3d at 22, quoting *Norman v. Reed*, 502 U.S. at 288–289, 112 S.Ct. 698, since it has long been established that "[i]ndividuals have constitutionally protected interests in free association and electoral participation, including the formation of new political parties." *Id.*, see also, *Anderson v. Celebrezze*, 460 U.S. 780, 793–794, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983); *Williams v. Rhodes*, 393 U.S. 23, 30–31, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968).

Further, Plaintiffs request the Court in injunctive mode to order Defendants to accept petitions gathered in the thirty (30) day period previous to filing at the State Elections Commission, rather than in the seven (7) day period prescribed in Article 3.002 of the Puerto Rico Electoral Act, 16 P.R. Laws Ann. § 3102. They also request the Court to order Defendants to accept "RPF"s filed with a list of registered voters organized by alphabetical order, rather than by the precinct were they are registered to vote. As to both of these requests, **Plaintiffs** are **ORDERED TO SHOW CAUSE** as to why the Court should not deny these petitions, as they may potentially fall under the doctrine set forth in *Buckley v. American Constitutional Law Foundation*, 525 U.S. 182, 185–191, 208, 214, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999), wherein the United States Supreme Court stated that statutes which have the effect of regulating the communicative aspect of petitioning must be differentiated from those which merely dispose or order the electoral process per se. The latter are subject to a lesser standard of review, as they may indirectly burden speech, but do not burden the "communicative" aspect or content of freedom of speech and association. The Supreme Court in *Buckley*, 525 U.S. at 214, 119 S.Ct. 636, accordingly stated:

> Some regulations govern the electoral process by directing the manner in which an initiative proposal qualifies for placement on the ballot. These latter regulations may indirectly burden speech but are a step removed from the communicative aspect of petitioning and are necessary to maintain an orderly electoral process. Accordingly these regulations should be subjected to a lesser standard of review.

The Court preliminary does not find these two challenged regulations onerous, to the point of affecting substantive First Amendment rights. Further, the request of Plaintiffs as to the number of days for filing at the SEC may eventually become moot, should the officials of the municipalities' Permanent Electoral Registration Boards ("Juntas de Inscripcion Permanentes"), and/or *ad hoc* notaries, be authorized to identify and authenticate signatures of the registered voters and notarize "RPF"s.

3. A Preliminary Injunction Hearing was scheduled to be held on April 9, 2003. The nature of the hearing changed due to Chief Judge Hon. Hector Laffitte's, Opinion & Order and Judgment in the case of *Jose E. Pérez–Guzmán v. Aurelio Gracia, et. al.*, 260 F.Supp.2d 389 (D.Puerto Rico 2003), and given Defendants' representation that they were respecting the injunctive order, and accepting "RPF"'s without the notarization requirement, that is via *ad hoc* notaries. Defendants in *Pérez–Guzmán* appealed the Court's Judgment. Plaintiffs in the instant case were thereafter permitted to amend the complaint in order to challenge the constitutionality of the statutes, on their face as well as in their application. The Preliminary Injunction Hearing was scheduled to be continued on April 25, 2003.

On April 25, 2003, the Court convened with all parties, and based on Hon. Chief Judge Laffitte's denial of the stay of the Judgment in *Pérez–Guzmán*, the Court scheduled an Initial Scheduling Conference to be held on June 19, 2003. Since the Court was also aware that Defendants in *Pérez–Guzmán* had requested the First Circuit Court of Appeals the stay of the judgment, the Court expressed that should the Court of Appeals grant the stay, then it was to schedule the hearing as to the injunctive relief. The Court understood that no injunctive relief was then needed. The Court of Appeals subsequently granted the stay of the judgment in *Pérez–Guzmán*, and the Injunction Hearing in the instant case was scheduled and held on July 11 and July 14, 2003.

the Court held a Hearing as to Plaintiffs' preliminary injunction request. Both parties submitted post-hearing briefs. (Docket Nos. 41 & 43).

Co–Plaintiff Limpieza Ciudadana is a new political party that has, prior to the filing of the instant case, registered its name and logo with the Elections Commission, as required under the Electoral Act. Individual Plaintiffs are requesting that the political party become a "Party by Petition".[4]

A "Party by Petition" as defined under the Electoral provisions and regulations, refers to:

> [a]ny group of citizens, who, with the purpose of participating on the electoral ballots in the next election, register as a political party, on or before the 1st of June of the year of the elections, shall be considered a party by petition, by way of filing sworn petitions to that effect before the Commission, subscribed by a number of voters no less than five (5) percent of the total votes cast for all candidates for the position of Governor in the preceding general elections ... (Regulation of January 22, 2002, Article 1, Section 1.4(a)).

**The Registration Process-**

Under the Puerto Rico Electoral Act, and regulations approved thereunder, any group of citizens willing to create and register a new, Commonwealth-wide political party by petition must engage in the following initial registration process[5]:

a. Submit to the Commission a political platform, an emblem or logo, the name of the organization and the names of the citizens that conform its Board of Directors. (Translated Regulation of January 22, 2002, Article 2, Sections 2.1 and 2.2).

b. Wait for the Commission's approval of the name and emblem. This process requires both the name and the emblem to be published in a newspaper of Commonwealth-wide circulation in order to ascertain whether other citizens or organizations raise any objections as per the criteria for objections set by the Electoral Act and the regulations that the Commission approves.[6] (Translated Regulation).

c. The Group of citizens proposing to register a political party shall file, with the Commission, a list of notary publics which they propose to use to swear the endorsement petitions. That also shall inform the addresses of these, as well as their signatures, and notarial seals. Any change that may come up as to these notaries shall be notified to the Commission at once.

> The Commission shall reject endorsement petitions sworn to before a notary public whose name was not previously informed. With regards to the functions of the notaries in this process of registration by petition, the pertinent dispositions of the "Notarial Law of Puerto Rico" shall apply. (Translated Regulation, Article 3, Section 3.1).

d. Provide a copy of the Registration Petition Form to the voter in the presence of a notary public, for the voter to fill the RPF and for the notary to pro-

---

4. A "Party by Petition" refers to a new Commonwealth-wide political party that becomes a registered party by submitting the required registration petitions. Registered parties have access to the ballot in the general elections.

5. Subsections a-h, are certified translations of the Commission's Regulation of January 22, 2002, (Joint Exhibit III).

6. Co–Plaintiff LC complied with requirements a-b.

ceed to authenticate the voter's signature and identification, and swear the petition. The petition shall include the voter's name, electoral number, precinct number, address, mother's name, father's name, age, voter's signature, and notary public's signature and seal. (Translated Regulation, Article 4, Section 4.7)(See also, Plaintiffs' Amended Complaint, Docket No. 28, p. 8).

e. Gather notarized RPF's for submission to the Commission, and then organize and list the RPF's in alphabetical order, by electoral precinct, using the names of each registered voter that signs the RPF's, in order to submit them to the Commission in a term not to exceed seven (7) days after the signing, and notarization of the petition. The petitions shall be filed with the Office of the Commission no later than seven (7) days after been sworn to before the notary public. And, the registration petitions shall include a "Filed Petition Report" when filed, prepared in an original and five (5) copies identified by precinct. (Translated Regulation, Article 4, Sections 4.5 and 4.6).

f. Copies of the registration petitions, grouped by precinct with their corresponding report, shall be sent to the Validation Unit to judge as to the correctness, legality, and validity of each one, comparing them against the original registration petition and any other document that may come from the records and archives of the Commission. (Translated Regulation, Article 6, Section 6.1).

g. The Validation Unit has a period of forty five (45) days, from the date of the filing, to judge on the petitions and accept or reject them by returning them to the group of citizens that filed them. All petitions, which are not rejected within the period herein established, shall be deemed as accepted and shall count in favor of the group that filed it. As of May 1st of the year when the general elections are to be held, the Validation Unit shall have fifteen (15), as of the date of filing, to evaluate and accept and reject the registration petitions. (Translated Regulation, Article 6, Section 6.1).

h. It takes the Validation Unit a period of approximately five (5)-ten (10) minutes to verify each. Should the petition be rejected, it shall be indicated on the petition, making a mark in the corresponding box. (Testimony of Mrs. Rosín Quiñones in Civil Case No. 02–2191(DRD), Transcript of the Preliminary Injunction Hearing of July 11, 2003, ps.16–17; Regulation, Article 6, Section 6.1). The Validation Unit shall then prepare a "Report of Rejected Registration Petitions", and as soon as the report is prepared, the group is immediately notified. (Testimony of Mrs. Rosín Quiñones in Civil Case No. 02–2191(DRD), Transcript of the Preliminary Injunction Hearing of July 11, 2003, p. 17; Regulation, Article 6, Section 6.1). Also, Mrs. Quiñones herself notifies the interested group of the rejected petitions. (*Id.*, p. 8).

At the Preliminary Injunction Hearing, both parties submitted various stipulations.[7] The Court mentions and summarizes those worthy of consideration for instant injunctive purposes.

1. In the 2000 elections, 2,012,035 voters cast votes for the position of Governor of Puerto Rico, out of a total of 2,447,032 registered voters. Five per-

---

7. Stipulations have been entered *ad verbatim,* as the parties submitted them at the Preliminary Injunction Hearing, except that the

Court added the phrase Puerto Rico Bar Association, to Stipulation No. 2. (See also Docket No. 39, as amended).

cent of that figure amounts to 100,607, which is the number of registration petitions that a new, commonwealth-wide political party would have to submit and get validated by the Elections Commission by June 1, 2004 in order to become a party by petition and have access to the 2004 election ballot.[8]

2. The "Colegio de Abogados de Puerto Rico (CAPR)" (Puerto Rico Bar Association), has 11,717 currently practicing the profession. From those 11,717, there is a total of 7,393 lawyers that are also active as notary public. (See Plaintiffs' Exhibit 1, Report from "Fondo de Fianza Notarial del Colegio de Abogados de Puerto Rico", prepared by Israel Pacheco Acevedo, Executive Secretary of the CAPR.)

3. The petition circulation drives for independent candidates can be done with *ad hoc* notaries. (Testimony of Ramón Jiménez Fuentes in Civil Case No. 01–2132(HL), Transcript of evidentiary hearing of January 13, 2003, at p. 5).

4. An *ad hoc* notary is a registered voter whom the Elections Commission authorizes to take oath on the registration petitions of independent candidates, aspirants in primaries. The independent candidates, and aspirants to primaries submit to the Commission the names of registered voters who act on their behalf as *ad hoc* notaries to gather and sign registration petitions. Those *ad hoc* notaries do not have to be employees or officers of the Elections Commission and do not have to be lawyers-notaries. (Testimony of Ramon Jimenez Fuentes in Civil Case No. 01–2132(HL),

Transcript of evidentiary hearing of January 13, 2003, at pp. 5–8.)

5. For the 1998 status plebiscite, which was a special election, *ad hoc* notaries gathered and signed petitions for the organization known as PROELA. The total number of petitions that PROELA filed and that the Commission approved was 2,769. After gathering that number of signed petitions, PROELA received $666,000.00 in public funds to campaign for one of the options that appeared on the ballot of the 1998 status plebiscite. PROELA submitted to the Commission the names of forty five (45) *ad hoc* notaries. There is no finding that the PROELA organization committed fraud in such petition circulation drive. PROELA, during 1998 status plebiscite, advocated the formula of free association, "libre asociacion", as read in Spanish; which obtained .3% of all the votes cast in the election, (1,566,207 votes, that is 4,536 votes).

6. Aspirants in party primaries also rely on citizens acting as ad hoc notaries to gather registration petitions in order to have access to primary ballots.

7. If a new political party gathers and the Commission validates the required number of registration petitions, they are entitled to the same resources that the other parties already have at the Elections Commission, including the right to have representation at the island's Permanent Registration Boards and other organisms and offices of the Commission. (Testimony of Ramón Jiménez Fuentes, at pp. 35–36.). Like the existing parties, they would be entitled to receive public funds and to participate in the decision-making process

---

8. See Article 3.001(3) of the Electoral Act, 16 P.R. Laws Ann. § 3101(3). Testimony of Ramón Jiménez Fuentes, Clerk of the Election Commission, in Civil Case No. 01–2132(HL), Transcript of evidentiary hearing of January

13, 2003, pp. 19–20, 25; Website of the Elections Commission, Results of the 2000gubernatorialelection,www.ceepur.net/elecciones2000/isla.php.

of the Commission. (*Id.*, at 36). Independent candidates, aspirants that win in primaries and the organization PROELA have no such rights and have not had them in the past.

## III. LEGAL ANALYSIS

### A. Power of Federal Courts to Examine Constitutionality of State Statutes-

Defendants, in their Motion to Show Cause and in Response to Plaintiffs' Request for Preliminary Injunction (Docket No. 20), aver that in the case of *Partido Acción Civil v. Estado Libre Asociado,* ——— P.R. Dec. ———, 2000 TSPR 29 (2000), and in *Partido Acción Civil v. Estado Libre Asociado,* ——— P.R. Dec. ———, 2000 TSPR 61 (2000), the Supreme Court of Puerto Rico held the challenged statutes constitutional. They further allege that "the methods by which the people of Puerto Rico and their representatives have chosen to structure the Commonwealth's electoral system are entitled to substantial deference ..., and that Puerto Rico is free to structure its political system to meet its 'special concerns and political circumstances.' " (Docket No. 20, p. 2).

■■■■ The Court briefly addresses the power and propriety of having federal courts examine the constitutionality of state and federal statutes. See generally, *Marbury v. Madison,* 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60 (1803). "From the early days of the Union, it has been clearly established that federal courts have the power to review the constitutionality of state laws, as interpreted by state tribunals." [9] *Martin v. Hunter's Lessee,* 1 Wheat. 304, 14 U.S. 304, 344, 4 L.Ed. 97 (1816) ("The courts of the United States can, without question, revise the proceed-ings of the executive and legislative authorities of the states, and if they are found to be contrary to the constitution, may declare them to be of no legal validity. Surely the exercise of the same right over judicial tribunals is not a higher or more dangerous act of sovereign power."). "This power arises under the Supremacy Clause of the U.S. Constitution, U.S. Const. art. VI." *Eubanks v. Wilkinson,* 937 F.2d 1118, 1122 (6th Cir.1991). "In exercising this power, however, federal courts must be deferential to state courts' interpretations of state law." *Sancho v. Texas Co.,* 308 U.S. 463, 471, 60 S.Ct. 349, 84 L.Ed. 401 (1940). When reviewing the constitutionality of a state statute, federal courts may "only consider the statute's plain meaning and authoritative state court constructions of the statute." *Cotton States Mutual Ins. v. Anderson,* 749 F.2d 663, 667 (11th Cir.1984). This deference to state courts' interpretations of their own laws has been specifically applied to Puerto Rico. See *Sancho,* 308 U.S. at 470–71, 60 S.Ct. 349, 84 L.Ed. 401; *Corporacion Insular de Seguros v. Garcia,* 680 F.Supp. 476, 482 (D.P.R.1988).[10]

However, this Court is not reinterpreting Puerto Rico law "or questioning the wisdom or efficacy of Puerto Rico statutes." *Nationwide,* 237 F.Supp.2d at 155. Simply, the Court has to determine, consistent with the Supremacy Clause and the judicial power of the federal courts, whether the challenged Electoral Law provisions conform to the First and Fourteenth Amendment requirements of the United States Constitution. The Court approaches this task providing deference towards the interpretations of the Puerto Rico Supreme Court. Nonetheless, any deference or reliance on that Court's inter-

---

9. *Morales v. Nationwide Insurance Co.,* 237 F.Supp.2d 147, 154–155 (D.P.R.2002).

10. *Id.,* at 155.

pretation of the challenged statutes, does not diminish this Court's duty to enforce federal constitutional law and rule on constitutional questions properly presented before the federal court.[11]

### B. Constitutionality of Article 3.001(3) of the Puerto Rico Electoral Act

In Puerto Rico, petitions to register new political "parties by petition" shall be notarized by an attorney duly admitted to practice by the Supreme Court of Puerto Rico, as only licensed attorneys may serve as notaries. 4 P.R. Laws Ann. § 2011; *RB Town & Country Realty, Inc. v. TLC Beatrice Int'l Holdings,* 966 F.Supp. 131, 132 (D.P.R.1997).

Article 3.001(3) states as follows:

"Party by Petition" shall be any group of citizens who, desiring to appear on the electoral ballot of a general election, shall register as a political party, on or before June 1 of the election year, by filing with the Commission sworn petitions to such effect, **before notary publics duly admitted to the practice of notary,** pursuant to the provisions of the Notary Public Act in effect, who shall collect from the Election Commission a fee of one (1) dollar for each valid, notarized petition signed by a number of electors of no less than five percent of the total votes cast for all candidates for the office of Governor in the preceding general election. A government program or political platform, as well as the names and addresses of the group of electors that constitute its central body, must also be presented. The party shall become registered upon acceptance of said sworn petitions, and from that time on may present a complete slate in all precincts in accordance with the procedures provided in this subtitle. (Emphasis ours).

Plaintiffs in this case are invoking their right to form a new party and to have a fair opportunity to win votes by attaining access to the election ballot. Plaintiffs are challenging the above cited statutory provision, which currently bars them from circulating, gathering, and signing registration petitions themselves as *ah hoc* notaries. Plaintiffs are being compelled to rely only on lawyers-notaries to participate in the political process, hence abridging Plaintiffs' First Amendments rights to free speech and association, and to vote. Plaintiffs contend that Article 3.001(3) has the effect of reducing the pool of potential circulators, and/or petitioners, given that out of 2.4 million registered voters, only 7,393 lawyers-notaries, licensed attorneys, are available and authorized to receive signed petitions to support the registration of a new Commonwealth-wide political party by petition.[12] Plaintiffs further aver that since the notaries must be members of the bar, the registration procedure, from the very beginning, is economically burdensome, requiring around 1,500,000 dollars to be able to register Limpieza Ciudadana as a new political "party by petition".

Defendants on the other hand allege, that if Plaintiffs are granted the right to file petitions without the notarization requirement, it would allow political groups "which lack even a minimum of popular support" to be certified by the Commission as a political party, without the appropriate safeguards against fraud. (Intervenor's Post–Hearing Memorandum, Docket No. 43, p. 1). Defendants further aver

---

**11.** *Nationwide,* 237 F.Supp.2d at 155.

**12.** Plaintiffs' Exhibit 1, Report from "Fondo de Fianza Notarial del Colegio de Abogados de Puerto Rico".

that Plaintiffs did not suffer any injury to their First Amendment rights for they allegedly never made a "good faith diligent effort" to obtain the requisite number of petitions to certify Limpieza Ciudadana as a political party by petition, and that there is no causal connection between the notarization requirement and Plaintiffs' failure to obtain the requisite number of petitions. Defendants also stated that other political groups in Puerto Rico have been able to comply and obtain ballot access as party's by petition under the challenged statutory framework.[13]

■ For more than three decades, the United States Supreme Court has fostered the constitutional right of citizens to create and develop new political parties. *Norman v. Reed*, 502 U.S. 279, 288, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992). "The right derives from the First and Fourteenth Amendments and advances the constitutional interest of like-minded voters to gather in pursuit of common political ends, thus enlarging the opportunities of all voters to express their own political preferences." *Id.*, quoting *Anderson v. Celebrezze*, 460 U.S. 780, 793–794, 103 S.Ct. 1564, 1572–1573, 75 L.Ed.2d 547 (1983); *Illinois Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979); *Williams v. Rhodes*, 393 U.S. 23, 30–31, 89 S.Ct. 5, 10–11, 21 L.Ed.2d 24 (1968). "Individuals have constitutionally protected interests in free association and electoral participation, including the formation of new political parties." *Cruz v. Melecio*, 204 F.3d 14, 22 (1st Cir.2000). *Colorado Republican Federal Campaign Comm'n v. Federal Election Comm.*, 518 U.S. 604, 616, 116 S.Ct. 2309, 2316, 135 L.Ed.2d 795

(1996) ("The independent expression of a political party's views is 'core' First Amendment activity no less than is the independent expression of individuals, candidates, or other political committees").

■ Accordingly, "the right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes. So also, the right to vote is heavily burdened if that vote may be cast for one party ... at a time when other parties are clamoring for a place on the ballot." *American Party of Texas v. White*, 415 U.S. 767, 781 n. 11, 94 S.Ct. 1296, 1306, 39 L.Ed.2d 744 (1974); following *NAACP v. Button*, 371 U.S. 415, 438, 83 S.Ct. 328, 340–341, 9 L.Ed.2d 405 (1963). Regarding the right to vote, ranked as "among the most precious freedoms", the Supreme Court held in *Williams v. Rhodes*, 393 U.S. at 31, 89 S.Ct. 5, that "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined."

■ "Only a compelling state interest in the regulation of a subject within the State's constitutional power to regulate can justify limiting First Amendment freedoms." *Id.* In that context, and to the degree that a "State would thwart this interest by limiting the access of new parties to the ballot", the Supreme Court has consistently called "for the demonstration of a corresponding interest sufficiently weighty to justify the limitation", *Norman*, 502 U.S. at 289, 112 S.Ct. 698; *Anderson*, 460 U.S. at 789, 103 S.Ct. 1564, and hence,

**13.** During the July 11, 2003 hearing, the parties stipulated that, under the current system (which requires new Commonwealth-wide political parties to rely on lawyers-notaries to gather, certify and sign the registration petitions), one party was registered and had access to the ballot, in the 1984 election. That was "Partido Renovación Puertorriqueña".

strictly required any severe restriction to be narrowly drawn to advance any such interest of compelling importance. *Norman, supra; Socialist Workers Party,* 440 U.S. at 184–186, 99 S.Ct. 983. It "[i]s beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the ... Fourteenth Amendment, which embraces freedom of speech." *Anderson,* 460 U.S. at 787, 103 S.Ct. 1564, *NAACP v. Alabama,* 357 U.S. 449, 460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958).

Following these constitutional standards, when deciding whether a state election law violates First and Fourteenth associational rights, Courts must "weigh the 'character and magnitude' of the burden the State's rule imposes on those rights, against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358, 117 S.Ct. 1364, 1370, 137 L.Ed.2d 589 (1997). Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest; a "sufficiently weighty" corresponding interest is required to justify the limitation. See *McIntyre v. Ohio Elections Commission,* 514 U.S. 334, 347, 115 S.Ct. 1511, 1519, 131 L.Ed.2d 426 ("When a law burdens core political speech, we apply 'exacting scrutiny', and we uphold the restriction only if it is narrowly tailored to serve an overriding state interest."), following, *First Nat. Bank of Boston v. Bellotti,* 435 U.S. 765, 786, 98 S.Ct. 1407, 1421, 55 L.Ed.2d 707 (1978).

The Court must also consider that "[c]onstitutional challenges to specific provisions of a State's election laws ... cannot be resolved by any 'litmus-paper test' that will separate valid from invalid restrictions", *Storer v. Brown,* 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974), since, no "bright line" isolates legal and permissible election-related regulation from unconstitutional infringements on First Amendment freedoms. *Timmons,* 520 U.S. at 358–359, 117 S.Ct at 1370. The Court has a duty to recognize the magnitude of the asserted injury to the rights Plaintiffs seek to vindicate. Then, the Court must 'identify and evaluate the precise interests put forward by the State as justification[s].' *Anderson,* 460 U.S. at 789, 103 S.Ct. 1564. Thereafter in the analysis, the Court determines the "legitimacy and strength of each of those interest's" and also "consider[s] the extent to which those interests make it necessary" to affect and/or interfere with Plaintiffs' First Amendments rights. *Id.* There may exist other alternative means, less burdensome, through which the State's interest may be advanced and only then and after weighing all those elements, the Court will be in a position to conclude whether the impeached provisions pass constitutional muster. "The results of this evaluation will not be automatic; as we have recognized, there is 'no substitute' for the hard judgments that must be made." *Anderson,* 460 U.S. at 789–790, 103 S.Ct. at 1570; *Storer,* 415 U.S. at 730, 94 S.Ct. at 1279.

**Notary Requirement-**

In the present case, Plaintiffs will need 100,607 signatures notarized by licensed attorneys, in order to qualify and register as a new political party by petition. Those 100,607 petitions can only be gathered, signed and sworn by a lawyer-notary public, from a pool of 7,393 notary public available in Puerto Rico, in order for the PRSEC to validate and accept them. Voters have to sign the petitions in the presence of the lawyer-notary, who in turn has

to verify the identity of the signer/voter, and certify that the voter signed the petition in his/her presence. During the Preliminary Injunction Hearing, Plaintiffs showed that in Puerto Rico, a notary public charges an approximate normal fee of fifteen to twenty dollars per affidavit, to notarize a signature, a simple document. Defendants did not produce any evidence to contradict the testimonies of the two notary publics produced by Plaintiffs.

Such "fair market price" is justified when taking into account the notary public duties and obligations required under Puerto Rico law.[14] Attorneys have to duly comply with the requirements set forth in the Notarial Act when notarizing the electoral document. An attorney/notary is obliged to certify that the person signing the document is who the signatory claims, and shall verify the voter's identity by, (i) examining the voter's driver's license, passport, or any other form of identification issued by the government, having the person's picture and signature; (ii) by certifying that he/she (the notary), personally knows the signatory. 4 P.R. Laws Ann. §§ 2035, 2091, 2092. Notary publics also have to transcribe by hand, in their affidavits logs, each and every one of the petitions signed and sworn before them. 4 P.R. Laws Ann. § 2094. Notary publics in Puerto Rico also have to submit a monthly report, due on or before the tenth day of each month, to the Notary Inspector's Office, in which they have to identify and describe each affidavit signed and sworn before them. 4 P.R. Laws Ann § 2023.

The report shall include the name of the parties, date the document was signed, subject/object of the transaction, and a brief description of the nature of the affidavit.[15]

Furthermore, if the notary public has been certified by the Commission to act as a notary for the purpose of registering a new political party by petition, he/she (the notary) shall have to submit a Report by Notary Public to the Commission, in which he/she (the notary) shall have to include the affidavit number through which the petition was gathered, the appearing party (voter), date of the oath, et al. Said report is due at the Commission every fifteen days in a given month, i.e., the third and eighteenth day of each month. (See Regulation, Article 3, Section 3.3).

Considering that the attorney has to comply with the above mentioned requirements, the "fair market price" dictates that any such notary, is justified to charge an average fee between fifteen and twenty dollars to notarize a single petition. Moreover, as testified by attorney notary public Rene Torres, should the notarization requires the attorney to travel outside his office, to the place where the petition gathering and signing is taking place, the fee may vary to a per hour basis amount and can increase up to seventy to one hundred dollars per hour. To that amount, the notary adds the mentioned fee per affidavit.[16]

Attorneys/notary publics assume further serious risks, as the notarial profession is

---

14. Testimony of Attorney René Torres in Civil Case No. 02–2191(DRD), at the Preliminary Injunction Hearing of July 11, 2003.

15. Testimony of Attorney René Torres in Civil Case No. 02–2191(DRD), at the Preliminary Injunction Hearing of July 11, 2003.

16. At the Preliminary Injunction Hearing, attorney notary public Rene Torres, stated that

he is not willing to notarize documents at the rate of one dollar the Commission has established, and that any petition gathering would have to be by appointment, at this office, and at no more than two afternoons per week. Further, at the Preliminary Injunction Hearing, the parties stipulated that notary public Madeline Colón would testify the same as attorney René Torres.

rigorously regulated by the Notarial Law and regulation. Indeed, the Supreme Court of Puerto Rico has severely sanctioned, has disqualified notaries from practicing notary, and even disbarred members from the legal profession, for not complying with the Notarial Act, and its regulations, when drafting and swearing affidavits, i.e., for not submitting the monthly report at the Inspector's Office.[17]

The Court considers that any fee ranging from fifteen to twenty dollars per affidavit is reasonable, considering the requirements set forth in the Notarial Law and the Commission's regulations, related to the registration of new political "parties by petition". In the present case, approximately 100,607 signatures at a cost of at least fifteen dollars would add up to approximately more than 1,500,000 dollars. As Hon. Chief Judge Laffitte intimated, "[t]his strikes the Court as an unreasonably high price tag for an individual who is seeking to exercise his constitutional rights." *Jose E. Pérez–Guzmán v. Aurelio Gracia, et. al.*, 260 F.Supp.2d at 392. Since not all available attorneys which engage in notarial work, are willing to serve as notaries for petitioners, the challenged statute has the effect of reducing the pool of circulators to sign and gather the

"RPF" 's. The described onerous restriction imposes a burden on voting and associational rights, which the Court finds no rational basis to support. The Court also finds that any citizen favoring Plaintiffs' political cause, will be at least deterred by the knowledge that such a high cost is required to serve and assure that the political party chosen will have a place on the electoral ballot.[18]

Defendants rely, for the strict scrutiny test, on the objectives sought by the State, to preserve the integrity of the electoral process, to prevent misrepresentation, maintain a stable political system, prevent ballot manipulation, discourage fraud, and thus justify the notarization requirement. Defendants further contend that the State has an interest in protecting fairness, integrity, and efficiency of the ballots, in order to prevent "irregular" and "fraudulent" petitions from being registered to form any new party. Defendants allege such interests prevail over Plaintiffs' First Amendment rights, since the notary-lawyer is the only state official who can avoid issuance of fraudulent petitions. The State's justification relies in that only lawyer-notaries provide the required integrity to the electoral process. They find a basis

---

**17.** See *In re: Lago Giberga*, 134 P.R.Dec. 502 (1993); *In re: Santiago Arroyo*, 132 P.R.Dec. 239 (1992); *In re: Jiménez Sabat*, 130 P.R.Dec. 202 (1992); *In re: Gómez Rijos*, 129 P.R.Dec. 811 (1992); *In re: Porrata–Doria Harding*, 128 P.R.Dec. 416 (1991); *In re: Cruz Ramos*, 127 P.R.Dec. 1005 (1991); *In re: Nogueras Cartagena*, 127 P.R.Dec. 574 (1990); *In re: Meléndez Mulero*, 124 P.R.Dec. 815 (1989); *In re: Serrano Casanova*, 124 P.R.Dec. 800 (1989); In re: *Sagardía Ruiz*, 124 P.R.Dec. 743 (1989); *In re: Hernández Ramírez*, 120 P.R.Dec. 366 (1988). See also *In Re Sepúlveda Girón*, 2001TSPR 153, October 24, 2001; *In Re Tejada Rivera*, 2001 TSPR 136, September 24, 2001. Refer to *In Re Félix Caratini Alvarado*, 2001 TSPR 46, March 9, 2001 (containing a compendium of cases wherein notary publics have been disciplined, both as lawyers and/or notary publics, for substantive and procedural failures in the filing of the monthly reports submitted to the Inspector's Office of the Supreme Court of Puerto Rico).

**18.** See *Timmons*, 520 U.S. at 366–367, 117 S.Ct. 1364. ("States also have a strong interest in the stability of their political system. (citations omitted). This interest does not permit a State to completely insulate the two-party system from minor parties' or independent candidates' competition and influence, (citations omitted), nor is it a paternalistic license for States to protect political parties from the consequences of their own internal disagreements.").

for such reason on the established **"tradition"** that, in electoral processes, only lawyer-notaries can, through their "dación de fe" ("reliance on faith"), avoid fraud and frivolous candidacies.[19] Defendants further aver that compliance with the lawyer-notary requisite has been in the past traditionally expected and demanded. However, "this Draconian construction of the statute would obviously foreclose the development of any political party lacking the [economical] resources …". *Norman v. Reed*, 502 U.S. at 289, 112 S.Ct. 698.

 Puerto Rico's notarization requirement is broader than necessary to serve the State's asserted interests. As in *Williams v. Rhodes*, 393 U.S. at 30, 89 S.Ct. 5, "in the present situation the state laws place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement on political beliefs, and the right of qualified voters, … to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms." The Supreme Court there held that "[c]ompetition ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms. New parties struggling for their place must have the time and opportunity to organize in order to meet reasonable requirements for ballot position, just as old parties have had in the past." *Id.*, at 32.

The Court is cognizant that the State has ample authority and broad discretion when regulating the electoral process.

That notwithstanding, any such regulations cannot impose severe and onerous restrictions, which may cause that the communicative rights of the First Amendment be severely curtailed. The Court explains.

To validate the registration petitions, the personnel of the Commission compares the information included in the registration petition with that in the records of the Commission, pertaining to each registered voter that signs each petition. Furthermore, copies of the registration petitions, grouped by precinct with their corresponding report, shall be sent to the Validation Unit to judge as to the correctness, legality, and validity of each one, comparing them against the original registration petition and any other document that may come from the records and archives of the Commission. (Regulation, Article 6, Section 6.1). The personnel of the Commission, at a "Board Meeting"[20] which convenes on a daily basis, checks and verifies petitions one by one, confronting the information of the signing elector contained therein, with the information that the Commission has of each elector, in their electoral lists and in the registration documents, where the voters initially stamp their signatures when registered as electors at the Commission. (Testimony of Mrs. Rosín Quiñones in Civil Case No. 02–2191(DRD), Transcript of the Preliminary Injunction Hearing of July 11, 2003, pp. 5,6,9,10,11,16,17). The verification includes comparing the signature of the vot-

---

**19.** The "tradition" was eloquently challenged in a vigorous dissent by Associate Justice Hon. Antonio Negrón García, in both of the Puerto Rico Supreme Court cases relied upon by Defendants. (See n. 2, *supra*, ps.3–6, Docket No. 18).

**20.** Said "Board" is composed of three staff employees from the Commission, which are as well, members if the three island-wide reg-

istered political parties, to wit, "PNP", "PPD", and "PIP". Those three employees are supervised by Mrs. Rosín Quiñones, Administrative Supervisor for the general archives at the PRSEC. (Testimony of Mrs. Rosín Quiñones in Civil Case No. 02–2191(DRD), Transcript of the Preliminary Injunction Hearing of July 11, 2003, pp. 8, 17).

er at the party by petition registration document, with the registered signature of the voter at the archives of the Commission.

The personnel from the Commission verify, (i) each voter's signature in the RPF, against their registered signature; (ii) they verify the notary's signature and seal, and if he/she has been certified by the Commission as a notary for the function of registering new parties by petition; (iii) if the voter's signature in the petition is compatible with the registered signature; (iv) if the petition was filed within the seven day requirement; (v) they then verify all the data, father's name, mother's name, etc. (Testimony of Mrs. Rosín Quiñones in Civil Case No. 02–2191(DRD), Transcript of the Preliminary Injunction Hearing of July 11, 2003, pp. 5, 6, 9, 10, 11, 16, 17). They further verify and confront the notary public's signature and seal, with the ones registered at the Commission; as only certified notary publics (by the Commission) can take oath and act as notaries for the purposes of registering new political parties by petition. Petitions are rejected upon easily verifiable information, to wit, (i) filed after the seven day requirement; (ii) signature not compatible with the voter's registered signature at the Commission; (iii) incomplete information.

Evidently, a burden than falls unequally on new or small political parties . . ., impinges, by its very nature, on associational choices protected by the First Amendment. *Anderson*, 460 U.S. at 793, 103 S.Ct. 1564. The notarization requirement,

and its "dación de fe" as to the information and identity of the voter for any given petition, is further verified and corroborated by personnel of the Commission. As such, the Electoral Law imposes a restriction that unduly places an unfair burden on Plaintiffs. After careful judicial scrutiny, "[i]t is specially difficult to justify a restriction that limits political participation . . . as any such challenged restriction operates as a mechanism to exclude certain classes of candidates [parties] from the electoral process." *Id.*

The foregoing limitation, notarization requirement, constitutes an unconstitutional measure, taken in "pursuit" of state objectives that can be served equally well in significantly less burdensome ways. *American Party of Texas*, 415 U.S. at 781, 94 S.Ct. at 1306. Defendants were ordered to show cause as to why *ad hoc* notaries should not be authorized to notarize registered voters' signatures, since such procedure merely entails the verification of the signatory-voter's identification, being that the individual's drivers license, passport, or any other identification issued by the government. The Court understands that there are other less intrusive and onerous methods through which the State's interest in protecting the integrity of the electoral process can be satisfied.[21]

**Notary Public vis a vis Ad Hoc Notary-**

The Court of Appeals for the First Circuit stated in the case of *Cruz v. Melecio*, 204 F.3d at 22, that "[i]f, for example, the appellants can prove that notarization is prohibitively expensive or otherwise diffi-

---

**21.** For example, officials and functionaries at each of the municipalities' Permanent Electoral Registration Boards ("Juntas de Inscripción Permanentes"), are allowed to verify registered voters' identification and to authenticate their signatures. Totally refusing to implement this mechanism, and instead exclusively requiring a lawyer-notary, charging fifteen dollars ($15.00) per notarization of

each "RPF", to provide correctness and legality to the procedure, violates, on its face, First Amendment rights. (A cost of around $1.5 million dollars would be potentially required to register a party, considering that around 100,000 "RPF"s would be required to comply with the 5% statutory requirement of the total of all votes cast in the last election). (See Order of the Court, Docket No. 18, p. 2).

cult to achieve ..., then the Commission will have to show that the notarization requirement is narrowly drawn to advance a compelling governmental interest".[22] Officials and functionaries, *ad hoc*, are available to certify the authenticity of all signatures they collect, thus providing to such supletory mechanism a presumption of "purity" in the electoral process. Only *ad hoc* notaries certified by the Commission are authorized to take oaths; notary publics themselves are required to undergo the same certification process of the Commission.[23] *Ad hoc* notaries may be required by the Commission, for example, to state in the petition the particular document utilized by the elector to verify identity.

*Ad hoc* notaries alleviate the onerous requirement of only permitting lawyer-notaries to authenticate registered voters' signatures and "RPF"s. This Court follows Hon. Chief Judge Laffitte's statements in *Jose E. Pérez–Guzmán v. Aurelio Gracia, et. al.,* 260 F.Supp.2d at 393, for that proposition:

> The Court can conceive of no reason— and Defendants have proffered none— why lawyer-notaries are necessary for the registration of new political parties. In other instances, the SEC relies on the services of ad hoc notaries. Presumably, they fulfill their duties adequately in those situations. Ad hoc notaries were allowed for the petitions of

the 1998 status plebiscite. If the SEC relies on ad hoc notaries for elections dealing with topics as important as the status of Puerto Rico, it is reasonable to assume that they would also be competent enough for the registration of new political parties. It is thus unclear why lawyers are required in the particular circumstances of the present case. A lawyer will notarize a signature merely by verifying the signatory's identification. This is not a complex task that requires special training or skill. There is no reason to believe that attorneys who happen to be notaries are somehow more adept than non-lawyers at reading and verifying an individual's drivers license or passport.

Furthermore, as in *Pérez–Guzmán,* there is no indication, on record, that lawyer notaries perform better than *ad hoc* notaries, for identity corroboration purposes. Personnel at the PRSEC strictly verify all the information gathered in each and every one of the petitions, both as to lawyer notary public submissions as well as *ad hoc's,* including the signature of the registered voter, on a one to one basis. No distinction is made whether or not the petitions are notarized by an attorney notary public or taken by an *ad hoc* notary. The latter occurring, when the *ad hoc* notaries have been allowed to take oath, pursuant to Law, regulation, or by Court Order.[24] The task of the Commission is

---

**22.** In *Cruz v. Melecio,* the First Circuit Court pointed out that notwithstanding that the Supreme Court sanctioned a notarization requirement in *American Party v. White, supra,* "there was no intimation that Texas restricted notarial status to members of the bar, and the relevant signature threshold was one percent of the active electorate, not five percent." *Cruz v. Melecio,* 204 F.3d at 22, n. 6.

**23.** Testimony of Mrs. Rosín Quiñones, Transcript of the Preliminary Injunction Hearing of July 11, 2003, pp. 11–12.

**24.** *Ad hoc* notaries have been allowed in primaries and in registration of independent candidates. (See Stipulations Nos. 4, 6, at p. 9–10 of this Opinion & Order). In the 1998 Status Plebiscite, the PROELA alternative was allowed to register via *ad hoc* notary petitions; two thousand seven hundred and sixty nine (2,769), petitions were presented, filed, and further approved by the Commission. (See Stipulation No. 5, at p. 9 of this Opinion & Order).

the same, on a one to one basis as to the verification, either in the case a notary public submits the petition, or in the case an ad hoc notary performs the same task. As soon as the document is received at the Commission, the petition is verified, personnel of the Commission "look it up in the system.. and seek the [registered] signature of the [newly submitted] electoral voter ... to ensure that all the facts are correct." [25] Accordingly, all the information gathered in the petition is verified "whether if it comes with [from] an ad hoc notary ... everything is verified just as if it were with a notary public." [26]

Defendants failed to prove a valid interest assuring that, through the notarization requirement (under Puerto Rican law/lawyer-notary public), new parties who are granted access to the ballot are bona fide and actually supported. Defendants did not comply with the burden of establishing that notarization by a licensed attorney is narrowly drawn to advance any such interests, thus undermining Plaintiffs' First Amendment rights. The notary-lawyer requirement sweeps broader than necessary to advance electoral order, and to serve the State's asserted interests; interests which, in any event, do not excuse the requirement's unconstitutional "deterrent" effect. While it is true that "[a]s a practical matter, there must be a substantial regulation of election if they are to be fair and honest.. and that some sort of order rather than chaos, is to accompany the democratic process" [27], it is also true that there are other alternate, less intrusive means to make sure that an accurate number of voters petitioners provide the statutory required ballot/petition support. Accordingly, since there are other less burdensome means of verifying signatures, the Court holds the requirement in Article 3.001(3) of the Electoral Law unconstitutional, on its face, and in violation of Plaintiffs' First Amendment rights.

This conclusion is reached as in past electoral processes, i.e., primaries, registration of independent candidates, and in recent plebiscites, *ad hoc* notaries have been authorized to take registered voters oath and authenticate their signatures. The Commission further verifies, both public notary petitions and *ad hoc* submissions in the exact same rigorous fashion. (All Commissioners, from all parties being present). Of significant repercussion is the fact that in plebiscites, which may determine the permanent political status of Puerto Rico, as opposed to a four (4) year electoral term, *ad hoc* notaries have been authorized.

Finally, Defendants rely [28] on the case of *Fishman v. Schaffer*, 429 U.S. 1325, 1328–1329, 97 S.Ct. 14, 50 L.Ed.2d 56 (1976), following *American Party of Texas*, 415 U.S. at 787, 94 S.Ct. 1296, as the only case touching on the subject (notarization requirement), and wherein the Supreme Court stated the following:

[*American Party of Texas v. White*, suggest that a requirement]..that all signatures be notarized as the time they are collected is not unconstitutional, at least absent more proof of "impracticability or

---

**25.** Testimony of Mrs. Rosín Quiñones, Transcript of the Preliminary Injunction Hearing of July 11, 2003, p. 4.

**26.** *Id.*, at pp. 6–7.

**27.** *Timmons*, 520 U.S. at 358, 117 S.Ct. 1364, accord *Storer*, 415 U.S. at 730, 94 S.Ct. 1274,

and *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217, 107 S.Ct. 544, 549–550, 93 L.Ed.2d 514.

**28.** Intervenor's Post Hearing Memorandum, ps. 13–14 (Docket No. 43).

unusual burdensomeness that was before the Court ..."

The Court there clearly found constitutional the requirement of "notarized signatures", but with two significant caveats, "absent more proof of impracticability" or "unusual burdensomeness ...". The *Fishman* case emanates from the State of Connecticut wherein notary publics are not required to be licensed attorneys.[29] However, the costs of registering a new political "party by petition" in Puerto Rico is both "burdensome" and "impractical", because of the high economical costs associated with the requirement of having licensed attorneys, acting as public notaries, notarize over 100,000 petitions. Hence, the case of *Fishman* ultimately favors Plaintiffs because the caveats of "burdensomeness" and "impracticability" are present in the instant case, precisely through the requisite of licensed attorneys acting as public notaries. Thus, making the entire registration procedure (lawyer-notary public requirement) impractical and economically burdensome. Defendants insistence on compliance, to test the law as to the lawyer notary requirement, places the "cart ahead the horses" and is hence, untenable.

## C. Constitutionality of Article 3102 of the Puerto Rico Electoral Act, and Regulations approved thereunder-

 Plaintiffs request the Court to order Defendants to accept petitions gathered in the thirty (30) day period prior to filing at the State Elections Commission, rather than in the seven (7) day period prescribed in Article 3.002 of the Puerto Rico Electoral Act. They further request the Court to order Defendants to accept "RPF"s filed with a list of registered voters organized by alphabetical order, regardless of the precinct were they are registered to vote.

Plaintiffs were duly ordered to show cause as to why these constitutional challenges, did not potentially fell under the doctrine set forth in *Buckley v. American Constitutional Law Foundation*, 525 U.S. at 185–191, 208, 214, 119 S.Ct. 636, wherein the United States Supreme Court stated that statutes which have the effect of regulating the communicative aspect of petitioning, must be differentiated from those which merely dispose or order the electoral process per se. In the Order, the Court mentioned that the "latter [challenges] are subject to a lesser standard of review, as they may indirectly burden speech, but do not burden the 'communicative' aspect or content of freedom of speech and association." (Docket No. 18, p. 3). The Court instructed Plaintiffs to respond to the mandate in *Buckley*, 525 U.S. at 214, 119 S.Ct. 636, wherein the Supreme Court stated:

Some regulations govern the electoral process by directing the manner in which an initiative proposal qualifies for placement on the ballot. These latter regulations may indirectly burden

---

**29.** Any person who is over 18 years of age, and a resident, or his principal place of business is in the State of Connecticut, can apply to take an examination to become an authorized notary public. See CT ST § 3–94b. The Connecticut law does not require applicants to be practicing attorneys. The Texas requirement for notary publics, also found constitutional in *American Party of Texas v. White*, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744

(1974), does not require applicants to be practicing attorneys. Relating to this matter, the Court in *Cruz v. Melecio*, 204 F.3d at 22, n. 6, stated the following, "[g]ranted that the Court sanctioned a notarization requirement in *American Party of Texas v.White*, (citation omitted), but there was no intimation that Texas restricted notarial status to members of the bar ...". See also, TX GOVT § 406.004.

speech but are a step removed from the communicative aspect of petitioning and are necessary to maintain an orderly electoral process. Accordingly these regulations should be subjected to a lesser standard of review.

The Court now, as originally hinted, does not find these two challenged regulations onerous, to the point of affecting substantive First Amendment rights. The Court explains.

■■■ It is sound law to the Court that States may enact reasonable electoral process regulations to avoid "campaign-related disorder". *Timmons,* 520 U.S. at 358, 117 S.Ct. 1364. In the same manner, and as indicated herein, there must be a substantial regulation of elections if they are to be fair and honest. *Id.* By the same token, "[l]esser burdens ... [on First Amendment rights], trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions'" *Id.,* following, *Burdick v. Takushi,* 504 U.S. 428, 434, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245; *Anderson,* 460 U.S. at 788, 103 S.Ct. 1564.

Nonetheless, at this initial stage, the Court finds it premature to hold both Article 3102, and other related regulations, in violation of the Constitution. Those requirements are procedural in nature, and do not affect content, speech per se. The Court is concerned that there has been no showing by Plaintiffs, of evidence to establish a reasonable and diligent effort to comply with such requirements. *Storer,* 415 U.S. at 742–743, 94 S.Ct. 1274. Plaintiffs have failed to offer proof to demonstrate that these requirements are somehow unduly burdensome to be complied,

and furthermore, there is no indication in the record that Plaintiffs consistently engaged upon such an effort. Without evidence that the regulations are unreasonable in terms of compliance, the Court may not reach Plaintiffs' conclusions. Whether and under what circumstances such regulations might be unconstitutional, because of excessive and unduly burdensome impingement on the First Amendment, is not a question that can be decided at a preliminary injunction stage. See *Baird v. Dept. of Public Health,* 599 F.2d 1098, 1102 (1st Cir.1979), for similar proposition. In the absence of such evidence, the Court can only assume that Article 3102 and the reporting regulations, are reasonable, and thus constitutional, until proven otherwise. *Id.*

The Court however is under the impression that compliance with these requirements, is strongly contingent upon the very first requisite of gathering, signing, and notarizing petitions. Plaintiffs only had the opportunity to gather the petitions through *ad hoc* notaries during an initial, two month period, the window created between the decision in *Perez–Guzman,* and the Circuit Court's granting of the stay of the Court's Order and Judgment.[30] Wherefore, since Plaintiffs are moving the Court to declare both procedural requirements unconstitutional, as a preliminary injunctive relief, the Court deems more appropriate to reserve this determination until later proceedings, if necessary.

The lawyer-notary public requirement contained in Article 3.001(3) of the Puerto Rico Electoral Act, 16 P.R. Laws Ann. § 3101(3), is thus found unconstitutional, as violating Plaintiffs' First and Fourteenth Amendments rights. The Commission, as required by the Circuit Court in

---

**30.** Cross Examination Testimony of Mr. Julio Vidal, at the Injunction Hearing, July 14, 2003.

*Cruz v. Melecio,* 204 F.3d at 22, has failed "to show that the notarization requirement is narrowly drawn to advance a compelling government interest." Defendants are ordered to accept Registration Petition Forms of voters by party petition, signed before *ad hoc* notaries. The Commission may order the *ad hoc* notaries to state the particular identification method, i.e., electoral identification card, driver's license, passport, and/or any other official governmental identification.

**IT IS SO ORDERED.**